UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

| | |
|---|---|
| Michael Lockwood, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>QUALITY EGG, LLC, d/b/a "Wright County Egg," an Iowa limited liability company;<br>and HILLANDALE FARMS OF IOWA, INC., an Iowa corporation.<br><br>Defendants. | Case No: _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

COMES NOW, the plaintiff, Michael Lockwood, individually and on behalf of all others similarly situated, ("Plaintiff" or "the Class") by and through undersigned counsel, hereby commences this action against defendants Quality Egg, LLC, and Hillandale Farms of Iowa, Inc., for compensatory, equitable, injunctive, and declaratory relief. Plaintiff makes the following allegations based upon Plaintiff's personal knowledge as to Plaintiff's own acts, and upon information and belief, as well as upon Plaintiff's attorneys' investigative efforts as to Defendants' actions and misconduct, and alleges as follows:

## INTRODUCTION

1.      Plaintiff brings this nationwide class action lawsuit, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on his own behalf and as a representative on behalf

of all persons who purchased or consumed shell eggs that were contaminated with the bacteria Salmonella Enteriditis ("Salmonella" or "SE").

2.      The Class asserts claims against QUALITY EGG, LLC, d/b/a "Wright County Egg," an Iowa limited liability company; and HILLANDALE FARMS OF IOWA, INC., an Iowa corporation (hereinafter "Defendants") for strict product liability; negligence; unjust enrichment; breach of implied warranties; and violation of consumer protection law and seeks to recover damages for personal injuries, refunds and/or for equitable and declaratory relief against Defendants.

3.      The food-borne disease -- "salmonellosis" -- has been linked to contaminated shell eggs produced by Defendants.

4.      Salmonellosis is a serious and sometimes fatal infection caused by food contaminated with a Salmonella bacterium, in this case Salmonella Enteritidis.

5.      On or about, August 13, 2010, the U.S. Food and Drug Administration ("FDA") issued a recall of all eggs contaminated with SE that were manufactured by Defendants.  At all relevant times, the recalled eggs were manufactured, marketed, and sold by Defendants.

6.      At all relevant times, Defendants misrepresented the safety of the eggs, and negligently manufactured, marketed, and distributed the eggs as safe for human consumption.

7.      At all relevant times, Defendants knew and had reason to know that the eggs were not safe for consumption, and therefore failed to operate in a safe and

continuous manner, causing serious medical problems and, in some patients, catastrophic injuries.

8.     At all relevant times, Defendants knew, and had reason to know, that their representations that the eggs were "safe" were materially false and misleading.

9.     As a result of Defendants' actions, Plaintiff and the Class experienced serious physical trauma.

10.     The primary goals of this class action are to: 1) thoroughly inform the public that eggs distributed by one or both of the Defendants may have been, and still could be, at an increased risk of serious and/or fatal infection, 2) reimburse moneys paid for the recalled items, 3) recover compensatory damages for personal injuries suffered, 4) award punitive damages for repeated "bad acts" over the several decades of egg production; and 5) enjoin Defendants from producing and/or marketing shell eggs until it can insure against future outbreaks of *Salmonella* related infections by remodeling the facilities, establishing state of the art testing policies and procedures.

## I. PARTIES

11.     Plaintiff, Michael Lockwood, is a 56 year old citizen of Elbow Lake, Grant County, Minnesota.   Plaintiff purchased Sunny Farm eggs, 12 and 18 count, from Walmart in Alexandria, Minnesota.   On or about August 17, 2010 Plaintiff ingested the eggs.   On or about August 18, 2010 he began to experience gastrointestinal distress, including severe abdominal cramping, nausea and profuse diarrhea.   Plaintiff was unable to work for the next three to four days due to the severity of the salmonellosis symptoms.

12.     On information and belief, the defendant QUALITY EGG, LLC, d/b/a "Wright County Egg" is an Iowa limited liability company, and citizen of Iowa, located at 2674 Highway 69, Galt, Iowa, 50101.  QUALITY EGG, LLC includes a number of layer farms, pullet farms and a feed mill.  At all times relevant, was engaged in the business of manufacturing and distributing shell eggs to customers nationally, including food retailers for resale, and restaurants for commercial use.

13.     Defendant HILLANDALE FARMS OF IOWA, INC. is an Iowa corporation with its principal place of business at 19 1/2 W Main Street, New Hampton, Iowa, 50659.  Defendant HILLANDALE FARMS OF IOWA, INC was engaged in the business of manufacturing and distributing shell eggs to customers nationally.

## II. <u>JURISDICTION, AND VENUE</u>

14.     Subject matter jurisdiction in this matter is proper under based on the diversity of the parties, and the amount in controversy exceeds five million dollars ($5,000,000.00) exclusive of interest and costs, both as required under 28 U.S.C. §1332(d)(2).

15.     Venue of this matter is proper in the United States District Court for the District of Minnesota, pursuant to 28 U.S.C. §1391(a), as a substantial part of the events or omissions giving rise to Plaintiff's claim set forth herein occurred in this judicial district.

## III. GENERAL FACTUAL ALLEGATIONS

### The Outbreak and Wright County Egg's Recalls

16.     Upon information and belief, on or about May 21, 2010, the Minnesota state public health authorities reported to the Center for Disease Control (hereinafter "CDC") of a localized outbreak of SE.

17.     Upon information and belief, on or about May 24, 2010, Minnesota state public health authorities traceback the source of the SE bacterium to shell eggs supplied by Hillandale Farms of New Hamptom, Iowa.

18.     Upon information and belief, on or about June 27, 2010, California state public health authorities report a state increase of SE infections.

19.     Upon information and belief, on or about July 21, 2010, the CDC notes "general sustained nationwide increase" in SE infections.

20.     Upon information and belief, on or about July 29, 2010, preliminary data of the California SE outbreak indicates the source of the bacterium as Wright County Eggs in Galt, Iowa.  Also, Colorado state public health authorities notify the CDC of a cluster of SE infections which are later identify Wright County Egg as the source of infection.

21.     On August 13, 2010, the Defendant Wright County Egg issued a recall of approximately 228,000,000 shell eggs that it had manufactured and distributed in recent months.  Wright County Egg had distributed the recalled eggs to food wholesalers, distribution centers, and foodservice companies in California, Illinois, Missouri, Colorado, Nebraska, Minnesota, Wisconsin and Iowa.  In turn, the companies that Wright County Egg had distributed to further distributed and sold the recalled eggs.

22.     On August 16, 2010, the Centers for Disease Control and Prevention (CDC) announced that it had observed an approximate four-fold nationwide increase, in late June and early July 2010, in reports of human illnesses caused by SE.

23.     Upon information and belief, in the days following Wright County Egg's recalls, numerous state health departments, including the Minnesota Department of Health, announced illnesses amongst state residents linked to eggs and egg products sold by Wright County Egg.

24.     On August 18, 2010, Wright County Egg expanded the recall described at paragraph 21 of this complaint to include approximately 380,000,000 eggs. To date, nearly 500,000,000 eggs have been recalled.

25.     On August 20, 2010, Hillandale Farms of Iowa, Inc. issued an additional recall for eggs distributed in fourteen states, including the following: Arkansas, California, Iowa, Illinois, Indiana, Kansas, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Texas, and Wisconsin.

26.     Upon information and belief, between May 1, 2010 and September 9, 2010 the CDC reports twenty-nine (29) event clusters were reported from 11 states; fifteen (15) of the twenty-nine (29) clusters have preliminarily been determined to have Wright County Egg as their infection source, and one (1) cluster has preliminarily been determined to have Hillandale Farms.

27.     Upon information and belief, between May 1, 2010 and September 7, 2010, the CDC reports approximately 1,519 reported illnesses are likely to be associated with the SE outbreak.

## EGG SAFETY CENTER LIST OF RECALLED EGGS

28.     On information and belief, Quality Egg, LLC d/b/a Wright County Farms recalled the following egg products:

- P1720 and P1942 with Julian dates ranging from 136 (May 16, 2010) to 229 (August 17, 2010)

- P1026, P1413, P1946 with Julian dates ranging from 136 (May 16, 2010) to 225 (August 13, 2010).

29.     On information and belief, Hillandale Farms of Iowa recalled the following egg products:

- P1860 with Julian dates ranging from 099 (April 9, 2010) to 230 (August 18, 2010)

- P1663 with Julian dates ranging from 137 (May 17, 2010) to 230 (August 18, 2010).

30.     Defendants own investigation identified more than fifteen (15) brand names under which their eggs were sold. As of September 22, 2010, the following brands were listed by the FDA as containing contaminated eggs:

| Brand Name | Pack Size | Plant Numbers and Julian Dates |
|---|---|---|
| Albertson | large white eggs, 6 egg carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Albertson | large white eggs, 12 dozen carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Albertson | large white eggs, 18 dozen carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Albertson | large white eggs, 2 ½ dozen sleeve | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Albertson | large white eggs, 5 dozen sleeve | Plant Number: 1167; Julian Dates: |

| Brand Name | Pack Size | Plant Numbers and Julian Dates |
|---|---|---|
| | | 214, 215, 219 |
| Albertson | large white eggs, 15 dozen bulk cube | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Albertson | large white eggs, 30 dozen bulk case | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Albertson | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413 or 1946, Julian Dates: 136 through 225 |
| Albertsons | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Code: 1720 or 1942, Julian Dates: 136 through 229 |
| Albertsons | Large 1 dz and 18 ct | Plant Code: 1156, Julian Date: 187 |
| Alta Dena Dairy | Loose 15 dozen units | Plant Codes: 1026, 1413, or 1946, Julian Code: 209 through 224 |
| Bayview | 5-dozen large overwrapped retail units | Plant Number: 1686, Julian Dates: 142 through 149 |
| Bayview | Large 5dz - overwrapped retail units | Plant Number: 1686K, Julian Dates: 195 through 196 |
| Becky | Large 5dz - overwrapped retail units | Plant Number: 1292 or 1091, Julian Dates: 139 through 161 |
| Boomsma's | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413, 1720, 1942 or 1946, Julian Dates: 136 through 229 |
| Cal Egg | Large 5dz - overwrapped retail units | Plant Numbers: 1292 or 1091, Julian Dates: 139 through 194 |
| California Ranch Fresh | 20 and 30 egg overwrap units | Plant Codes: 1026, 1413, or 1946, Julian Code: 209 through 224 |
| Cardenas Market | 60-egg cases - overwrapped | Plant Numbers: 1026, Julian Dates: 136 through 228 |
| Challenge Dairy | Loose 15 dozen units | Plant Codes: 1026, 1413, or 1946, Julian Code: 209 through 224 |
| Country Eggs, Inc. | 15 dozen bulk pack | Plant Numbers: 1946 or 1026, Julian Dates: 216 through 221 |
| Driftwood Dairy | Loose 15 dozen units | Plant Codes: 1026, 1413, or 1946, Julian Code: 209 through 224 |
| Dutch Farms | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413, or 1946, Julian Dates: 136 through 225 |
| Farm Fresh | 6-egg cartons, dozen egg cartons, | Plant Numbers: 1026, 1413, 1720, |

| Brand Name | Pack Size | Plant Numbers and Julian Dates |
|---|---|---|
| | 18-egg cartons, and loose eggs for institutional use and repackaging | 1942 or 1946, Julian Dates: 136 through 229 |
| Farmer's Gems | Large 1 dozen | Plant Code: 1156, Julian Date: 187 |
| Glenview | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1720 or 1942, Julian Dates: 136 through 229 |
| Glenview Farms | large white eggs, 6 egg carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Glenview Farms | large white eggs, 12 dozen carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Glenview Farms | large white eggs, 18 dozen carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Glenview Farms | large white eggs, 2 ½ dozen sleeve | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Glenview Farms | large white eggs, 5 dozen sleeve | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Glenview Farms | large white eggs, 15 dozen bulk cube | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Glenview Farms | large white eggs, 30 dozen bulk case | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Hidden Villa Ranch | Loose 15 dozen units | Plant Codes: 1026, 1413, or 1946, Julian Code: 209 through 224 |
| Hillandale | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413, or 1946, Julian Dates: 136 through 225 |
| Hillandale Farms | 6-egg cartons, dozen-egg cartons, 18-egg cartons, 30-egg package, and 5-dozen cases | Plant Number: 1860 with Julian Dates 099 through 230 or Plant Number: 1663 with Julian Dates 137 through 230 |
| James Farms | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1720 or 1942, Julian Dates: 136 through 229 |
| Kemps | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413, 1720, 1942 or 1946, Julian Dates: 136 through 229 |
| Liborio Market | large white eggs, 6 egg carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Liborio Market | large white eggs, 12 dozen carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |

| Brand Name | Pack Size | Plant Numbers and Julian Dates |
|---|---|---|
| Liborio Market | large white eggs, 18 dozen carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Liborio Market | large white eggs, 2 ½ dozen sleeve | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Liborio Market | large white eggs, 5 dozen sleeve | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Liborio Market | large white eggs, 15 dozen bulk cube | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Liborio Market | large white eggs, 30 dozen bulk case | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Lucerne | Large 5dz - overwrapped retail units | Plant Number: 1292, Julian Dates: 139 through 210 |
| Lucerne | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413, 1946, Julian Dates: 136 through 225 |
| Lund | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413, 1720, 1942 or 1946, Julian Dates: 136 through 229 |
| Market Pantry | extra large eggs, 1 dozen | Plant Number: 1906, Julian Dates: 211, 218, 219 |
| Mi Pueblo | Large 5dz- overwrapped retail units | Plant Numbers:1292 or 1091, Julian Dates: 139 through 161 |
| Mountain Dairy | 5-dozen medium overwrapped retail units | Plant Number: 1951, Julian Dates: 193 through 208 |
| Mountain Dairy | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413, 1720, 1942 or 1946, Julian Dates: 136 through 229 |
| Mountain Dairy | Large 1 dozen | Plant Code: 1156, Julian Date: 187 |
| No Brand Name Available | Large Loose 15 dz. | Plant Code: 1382; Julian Dates: 152, 153, 155, 160, 161, 164; Expiration Dates: 6/30/10 to 7/12/10 |
| No Brand Name Available | Large Loose 30 dz. | Plant Code: 1382; Julian Dates: 152, 160, 167, 175; Expiration Dates: 6/30/10 to 7/23/10 |
| No Brand Name Available | Foodservice pack - large loose | Plant Code: 1156, Julian Date: 187 |
| Nulaid | Large 2.5dz - overwrapped retail | Plant Numbers: 1292 or 1091, Julian |

| Brand Name | Pack Size | Plant Numbers and Julian Dates |
|---|---|---|
| | units | Dates: 139 through 161 |
| Nulaid | Large 5dz - overwrapped retail units | Plant Numbers: 1292 or 1091, Julian Dates: 139 through 210 |
| Nulaid | 5-dozen medium overwrapped retail units | Plant Number: 1091, Julian Dates: 167 through 174 |
| Nulaid | 5-dozen medium overwrapped retail units | Plant Number: 1951, Julian Dates: 195 through 210 |
| Pacific Coast | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1720 or 1942, Julian Dates: 136 through 229 |
| Ralph's | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413, 1720, 1942 or 1946, Julian Dates: 136 through 229 |
| Sam's | Bulk Pack 15 dz. | Plant Code: 1382; Julian Dates: 151, 152, 158, 159, 160, 164, 168; Expiration Dates: 6/29/10 to 7/16/10 |
| Shamrock Foods | large white eggs, 6 egg carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Shamrock Foods | large white eggs, 12 dozen carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Shamrock Foods | large white eggs, 18 dozen carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Shamrock Foods | large white eggs, 2 ½ dozen sleeve | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Shamrock Foods | large white eggs, 5 dozen sleeve | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Shamrock Foods | large white eggs, 15 dozen bulk cube | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Shamrock Foods | large white eggs, 30 dozen bulk case | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Shoreland | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413, 1946, Julian Dates: 136 through 225 |
| Shurfresh | extra large eggs, 12 dozen carton | Plant Number: 1906; Julian Dates: 211 and 218 |
| Sparboe Farms | large white eggs, 6 egg carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Sparboe Farms | large white eggs, 12 dozen carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |

| Brand Name | Pack Size | Plant Numbers and Julian Dates |
|---|---|---|
| Sparboe Farms | large white eggs, 18 dozen carton | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Sparboe Farms | large white eggs, 2 ½ dozen sleeve | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Sparboe Farms | large white eggs, 5 dozen sleeve | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Sparboe Farms | large white eggs, 15 dozen bulk cube | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Sparboe Farms | large white eggs, 30 dozen bulk case | Plant Number: 1167; Julian Dates: 214, 215, 219 |
| Sparboe Farms | large white eggs, 18 dozen carton | Plant Number: 1906, Julian Date: 219 |
| Sparboe Farms | extra large eggs, loose 15 dozen | Plant Number: 1906, Julian Date: 219 |
| Sun Valley | 5-dozen medium overwrapped retail units | Plant Number: 1951, Julian Dates: 195 through 209 |
| Sunny Farms | 6-egg cartons, dozen-egg cartons, 18-egg cartons, 30-egg package, and 5-dozen cases | Plant Number: 1860 with Julian Dates 099 through 230 or Plant Number: 1663 with Julian Dates 137 through 230 |
| Sunny Meadow | 6-egg cartons, dozen-egg cartons, 18-egg cartons, 30-egg package, and 5-dozen cases | Plant Number: 1860 with Julian Dates 099 through 230 or Plant Number: 1663 with Julian Dates 137 through 230 |
| Sunshine | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413, 1946, Julian Dates: 136 through 225 |
| Trafficanda | 6-egg cartons, dozen egg cartons, 18-egg cartons, and loose eggs for institutional use and repackaging | Plant Numbers: 1026, 1413, 1946, Julian Dates: 136 through 225 |
| Trafficanda Egg Ranch | Medium, large, x-large, and jumbo 12-egg cartons, 5-dozen medium over wrap, 20 count over wrap | Plant Numbers: 1026, 1413, 1720, 1942 or 1946, Julian Dates: 136 through 229 |
| Wagon Trail Large | 5 dz. only | Plant Code: 1382; Julian Date: 150; Expiration Date: 6/28/10 |
| West Creek | Large Loose 15 and 30 dz. | Plant Code: 1382; Julian Date: 150; Expiration Date: 6/28/10 |
| West Creek | 15 and 30-dozen tray packs | Plant Number: 1860 with Julian Dates 099 through 230 or Plant Number: 1663 with Julian Dates 137 through 230 |

| Brand Name | Pack Size | Plant Numbers and Julian Dates |
|---|---|---|
| Wholesome Farms | 15 and 30-dozen tray packs | Plant Number: 1860 with Julian Dates 099 through 230 or Plant Number: 1663 with Julian Dates 137 through 230 |
| Yucaipa Valley | Large 1 dozen | Plant Code: 1156, Julian Date: 187 |

## FDA INSPECTIONS AND PRELIMINARY REPORT

31.     The Food and Drug Administration's ("FDA") Department of Health and Human Services investigated Wright County Egg's egg manufacturing facilities in Galt, Iowa, including on-site inspections at its various egg laying farms/plants between August 12 and August 30, 2010.

32.     On August 30, 2010, the FDA chronicled its findings from the on-site inspection in a Form 483 issued to Wright County Egg's Chief Operating Officer, Peter A. DeCoster.  The FDA's findings included the following:

32.1.     Chicken manure located in the manure pits below the egg laying operations was observed to be approximately 4 feet high to 8 feet high at the following locations: Layer  1 — House 1; Layer 3 — Houses 2, 7, 17, and 18.  The outside access doors to the manure pits at these locations had been pushed out by the weight of the manure, leaving open access to wildlife or domesticated animals.

32.2     Un-baited, unsealed holes appearing to be rodent burrows located along the second floor baseboards were observed inside Layer 1 —

Houses 1-9 and 11-13; Layer 2— Houses 7 and 11; Layer 3 —
Houses 1, 3, 4, 5, and 6; Layer 4 — House 3.

32.3.    Dark liquid which appeared to be manure was observed seeping
through the concrete foundation to the outside of the laying houses at
the following locations: Layer 1 — Houses 1, 2, 3, 4, 5, 8, 11, 12,
and 14; and Layer 3 — Houses 1, 8, 13, and 17.

32.4.    Standing water approximately 3 inches deep was observed at the
southeast corner of the manure pit located inside Layer 1 — House
13.

32.5.    Un-caged birds (chickens having escaped) were observed in the egg
laying operations in contact with the egg laying birds at Layer 3 —
Houses 9 and 16.  The un-caged birds were using the manure, which
was approximately 8 feet high, to access the egg laying area.

32.6.    Layer 3 — House 11, the house entrance door to access both House
11 and 12 was blocked with excessive amounts of manure in the
manure pits.

32.7.    There were between 2 to 5 live mice observed inside the egg laying
Houses 1, 2, 3, 5, 7, 9, 10, 11, and 14.

32.8.    Live and dead flies too numerous to count were observed at the
following locations inside the egg laying houses: Layer 1 — Houses
3, 4, 6, 8, 9, 11, and 12; Layer 2 — Houses 7 and 11; Layer 3 —

Houses 3, 4, 4, 5,7, 8, 15, 16, 17, and 18.  The live flies were on and around egg belts, feed, shell eggs and walkways in the different sections of each egg laying area. In addition, live and dead maggots too numerous to count were observed on the manure pit floor located in Layer 2 — House 7.

32.9.    You did not document washing and disinfecting of your dead hen truck and manure equipment prior to moving from farm to farm.

32.10.   You did not maintain records documenting the washing and disinfection of the trailers used for the movement of pullets to laying houses.

32.11.   Birds were observed roosting and flying, chicks heard chirping in the storage and milking facilities. In addition, nesting material was observed in the feed mill closed mixing system, ingredient storage and truck filling areas.

32.12.   Outdoor whole kernel corn grain bins 4 and 6 observed to have the topside doors/lids open to the environment and pigeons were observed entering and leaving these openings. Birds were also observed sitting/flying around and over the openings.

32.13.   Samples collected during the course of this inspection and tested by an FDA laboratory revealed the following positive analytical results for *Salmonella* Enteritidis:

i.   On 8/13/2010, an environmental sample was collected from Layer 2, house 7 manure swab from row 1 — left side.

ii.   On 8/16/2010, an environmental sample was collected from Layer 2, house 11 at manure scraper blade from row 3 — right side.

iii.   On 8/13/2010, an environmental sample was collected from Layer 4, house 3 at walkway 1 — right side and walkway 3 — right side.

iv.   On 8/14/2010, a sample of meat and bone meal was collected from ingredient bin 7 located at your feed mill.

v.   On 8/17/2010, a sample of finished feed "Developer" pullet feed was collected from the feed mill.

vi.   On 8/16/2010, an environmental sample was collected from the roof level covered ingredient bin chute 8; Second Floor ingredient bin cover 19 (ingredient bin 19 holds ground corn) located at your feed mill.

33.    The FDA's Department of Health and Human Services launched a parallel investigation into Hillandale Farms of Iowa's egg manufacturing facilities on August 19. The investigation included on-site inspections at its various egg laying farms/plants between August 19 and August 26, 2010.

34.    Ultimately, the FDA issued a Form 483 following their investigation of Hillandale Farms's manufacturing facilities.  Their findings included the following:

34.1   Unsealed rodent holes were observed in West Union House— 1, 4, 5, and 8.

34.2   Live rodents were observed in West Union House—4, 5.

34.3   Gaps in the facility structures were found in West Union House— 1, 3, 5, 6, 7, 8; and Alden House— 1, 3, 6, 7, and 9.

34.4   Liquid manure was observed leaking in Alden House— 8 and West Union House— 7.

34.5   Un-caged hens were tracking manure from the manure pit into the upper level of the caged hen house area in West Union House— 7, 4.

34.6   Samples collected during the course of the inspection and tested by a FDA laboratory, revealed the following positive test results for *Salmonella Entertidis*: Spent water from the egg wash station

## HISTORY OF PROBLEMS BY DEFENDANT QUALITY EGG, LLC

35.   Upon information and belief, farms owned by QUALITY EGG, LLC, owner Austin "Jack" DeCoster, were the source of a 1987 SE outbreak in the Northeast that killed nine (9) people and sickened hundreds of people.  This outbreak remains the deadliest outbreak related to SE in the United States.

36.   Upon information and belief, two other SE outbreaks in the United States were linked to farms owned by Mr. DeCoster the following year.

37.     Upon information and belief, farms owned by Mr. DeCoster again obtained positive test results for Salmonella contaminations in 1991.  Eggs from those same farms were identified as the source of a Salmonella outbreak in 1992.

38.     Upon information and belief, in 1997, DeCoster Egg Farms agreed to pay $2 million in fines to settle citations brought in 1996 for health and safety violations at Mr. DeCoster's farm in Turner, Maine.

39.     Upon information and belief, eggs produced by farms owned by Mr. DeCoster, including QUALITY EGG, LLC, have previously not allowed to be sold in the states of Maryland and New York.

40.     Upon information and belief, the state of Iowa in 2000 designated Mr. DeCoster as a "habitual violator" of environmental regulations for problems that included hog manure runoff into waterways.   The label made him subject to increased penalties and prohibited him from building new farms.

41.     Upon information and belief, Mr. DeCoster and his farms, which includes QUALITY EGG, LLC, have been cited for other legal violations including but not limited to:

> (A)     In 2002, the federal Equal Employment Opportunity Commission announced a more than $1.5 million settlement of an employment discrimination lawsuit against DeCoster Farms on behalf of Mexican women who reported they were subjected to sexual harassment, including rape, abuse and retaliation by some supervisory workers at Mr. DeCoster's Wright County plants.

(B)     In 2007, 51 workers were arrested during an immigration raid at six DeCoster egg farms.  The Mr. DeCoster's farms have been the subject of at least three previous raids.

(C)     In June 2010, Maine Contract Farming - the successor company to DeCoster Egg Farms - agreed in state court to pay $25,000 in penalties and to make a one-time payment of $100,000 to the Maine Department of Agriculture over animal cruelty allegations that were spurred by a hidden-camera investigation by an animal welfare organization.

42.     Upon information and belief, Congressional investigators, in preparation for a hearing before Congress' Committee on Energy and Commerce Subcommittee on Oversight and Investigations titled "The Outbreak of Salmonella in Eggs", reported in September 2010 that Wright County Egg failed to report evidence of positive Salmonella test results dating back to 2008 to local, state or federal officials.

## EGG SAFETY RULE

43.     On July 9, 20009 the FDA enacted the Egg Safety Rule (74 FR 33030. 2009-07-09) to address SE contamination on egg farms which required, amongst other things, manufactures put in place certain compliance producers.  The regulation provides, in part, shell egg producers shall: 1) implement measures to prevent SE from contaminating eggs on the farm; 2) implement measure to prevent SE from further growth during egg storage; and 3) register with FDA.  Large-scale egg producers that produce shell eggs for human consumption and that do not sell all of their eggs directly to

consumers must comply with the refrigeration requirements under the rule, including producers whose eggs receive treatments such as pasteurization.  Those who transport or hold shell eggs must also comply with this rule.  Defendants are large-scale egg producers.

## **PLAINTIFFS' INJURIES**

44.     Consumption of contaminated eggs has placed and may continue to place Plaintiff and the Class at a greater risk of contracting salmonellosis from SE.

45.     Salmonellosis is a serious infection caused by food contaminated with the bacterium Salmonella.  Salmonella is the name of a group of bacteria and the most common cause of food poisoning in the United States.

46.     Salmonella is commonly found in the digestive track of animals and can be carried by the anima without appearing ill.  Salmonella bacteria can be killed by pasteurization and other heating procedures such as thorough cooking.

47.     In this specific case the bacterium has been identified as SE.  SE can be found inside perfectly normal-appearing eggs.  SE infects the ovaries of healthy appearing hens and contaminates the eggs before the shells are formed.  An infected hen can lay normal eggs as well as eggs contaminated with SE.

48.     A person with Salmonellosis will usually suffer from fever, and gastrointestinal symptoms such as abdominal cramping, nausea and/or diarrhea.

49.     Salmonellosis can be more serious in older adults, infants, and persons with chronic illnesses or impaired immune systems.  In a small percentage of those who

recover from an infection may later develop recurring joint pain, reactive arthritis and Reiter's syndrome.

## CLASS ALLEGATIONS

50.     Plaintiff intends to seek an order certifying the following classes pursuant to Rule 23(b)(3) and (c)(4) of the Federal Rules of Civil Procedure:

*1.  The Injury Class*

All persons, throughout the United States who purchased eggs manufactured and/or distributed by Defendants, QUALITY EGG, LLC, d/b/a "Wright County Egg," and HILLANDALE FARMS OF IOWA, INC between April 9, 2010 and August 17, 2010 and suffered a physical injury as a result of consuming the Defendants' eggs.

*2.  The Economic Loss Class*

All persons, throughout the United States who purchased eggs manufactured and/or distributed by Defendants, QUALITY EGG, LLC, d/b/a "Wright County Egg," and HILLANDALE FARMS OF IOWA, INC between April 9, 2010 and August 17, 2010 and did not suffered a physical injury as a result of consuming the Defendants' eggs.

51.     *Numerosity – Rule 23(a)(1):*  On information and belief, the number of persons effected by Defendants' conduct numbers in the thousands, if not tens of thousands.  Specifically, to date, more than 1,500 people have reported suffering some

form of physical injury as a result of consuming Defendants' eggs.   Additionally, as of the date of this Complaint Defendants have recalled more than 500,000,000 eggs which they placed into the stream of commerce.   Joinder of these claims in one proceeding is impractical.   Numerosity exists for both the Injury Class and Economic Loss Class.

52.   *Commonality – Rule 23(a)(2)*:   Common questions abound in this case. They include, but are not limited to the following:

A.   Whether Defendants manufactured, distributed, and/or sold a defective product;

B.   Whether the products manufactured by Defendants were contaminated by the salmonella bacteria;

C.   Whether Defendants failed to comply with applicable federal and state statutory regulations;

D.   Whether Defendants' conduct entitles the Class to an award of punitive damages;

E.   Whether the Defendants actions constitute a violation of all states Consumer Protection Statutes[1];

F.   Whether Defendants breached the implied warranties that its product was of merchantable quality and was safe and fit for human consumption;

---

[1] Ark. Code Ann. 4-88-107(a)(1): Cal. Civ. Code 1770: Colo. Rev. Stat. 6-1-105(1): Ill 815 ILCS 505/2: Ind. Code 24-5-0.5.3(a): Ind. Code 24-5-0.5- 4: Iowa Code 714.16.2(a): Kan. Stat. Ann. 50-626(b): Minn. Stat. 325D.44: Mo-Rev. Stat. 407.020.1: Neb. Rev. Stat. 59-1602: N.D. Cent. Code 51- 15-02: Ohio Rev. Code Ann. 1345.02(a): S.D. Codified Laws Ann. 37-24-1: Tenn. Code Ann. 47-18-104: Tex. Bus. & Com. Code Ann. 17.46(a): Wis. Stats. Ann. 100.18(1).

G.      Whether Defendants are strictly liable for the manufacture, distribution and/or sale of a defective product; and

H.      Whether Plaintiffs are entitled to refunds for the purchases of the products identified herein.

53.     *Typicallity – Rule 23(a)(3)*:    The claims of the Plaintiff are typical of the claims of the class.  Plaintiff and the class sustained damages arising out of Defendants' improper and negligent conduct.  The losses of each class member were directly and proximately caused by Defendants' improper and negligent conduct, and the Plaintiff has no claims that are antagonistic to those of the class.

54.     *Adequacy 0 Rule 23(a)(4)*:  Plaintiff, Michael Lockwood, will fairly and adequately represent the Class.  He has retained counsel who are competent and experienced in state and federal class action and complex litigation.  He has no interests that are antagonistic to the Class.

55.     *Predominance – Rule 23(b)(3)*:  The questions set forth in Paragraph 52 predominate over any questions affecting only individual persons.  For example, issues related to the defective nature of Defendants product will be identical for all Class members.  Similarly, whether the Defendants' conduct rises to the level of punitive damages applies equally to the entire class.

56.     *Superiority – Rule 23(b)(3)*:  This Class Action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this action.   In this case, the overwhelming majority of the claims are likely to be small meaning that absent a class

action the expense and burden of individual litigation make it difficult, if not impossible, for members of the class to redress the wrongs done to them individually.

57.     *Certification Pursuant to 23(c)(4)*:   Rule 24(c)(4) allows the Court the discretion to certify "issues" for trial.   Here, the Injury Class is uniquely situated to fall within this rule.   As noted in paragraph 52 above, common issues of both fact and law apply equally to each member of the Injury Class.    Those issues include, without limitation:

A.      Whether Defendants owed the Class a duty of care;

B.      Whether Defendants breached the duty of care by manufacturing, distributing and selling egg products containing SE;

C.      Whether Defendants' manufacturing processes violated state or federal law; and

D.      Whether the Class is entitled to punitive damages as a result of Defendants' conduct.

These common issues may be certified under Rule 23(c)(4).  Accordingly, Plaintiffs seek and Order from this Court certifying certain issues for trial.

58.     Plaintiff seeks a refund of and restitution for monies paid as a result of his purchase of contaminated eggs, as well as all other ascertainable economic loss that occurred as a result of Defendants' wrongful and improper conduct in connection with the manufacture, marketing, distribution, testing, promotion, labeling and/or selling of their contaminated eggs.  Plaintiff therefore seeks to disgorge Defendants of the monies inappropriately acquired as a result of their sale of contaminated eggs.

# IV.    CLAIMS FOR RELIEF

## COUNT I
## STRICT LIABILITY

59.    Plaintiff, on behalf of himself and all other similarly situated realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein.

60.    Defendants were at all times relevant to this matter engaged in the business of the manufacturing, supplying, selling, advertising and otherwise distributing the adulterated food product that is the subject of the action.

61.    The contaminated eggs that the defendants manufactured, distributed, and sold were, at the time it left the defendant's control, defective and unreasonably dangerous for their ordinary and expected use because it contained *SE*, a deadly pathogen.

62.    The contaminated eggs the Defendants manufactured, distributed, and sold were delivered to the plaintiff class without any change in their defective condition. The contaminated eggs the Defendants manufactured, distributed, and sold were used in the manner expected and intended, and was consumed by the plaintiff class.

63.    The Plaintiff ingested the eggs in a manner for which it was reasonably foreseeable by the Defendants.

64.    The Plaintiff was not aware of, and could not have reasonably discovered, the dangerous nature of the contaminated eggs.

65.     The Defendants' contaminated eggs caused increased risk of injury upon ingestion and therefore constituted a product unreasonably dangerous for normal use due to its defective manufacture, and the Defendants' misrepresentations of safety and inadequate facts disclosed to Plaintiff class.

66.     The Plaintiff suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the contaminated eggs that the defendants manufactured, distributed, and sold.   These damages include, but are not limited to: physical and mental pain and suffering, past and future in the form of the pain and suffering, including bodily suffering, discomfort and loss of enjoyment of life; and medical costs and expenses to this point and the present value of reasonable medical expenses in the future.

67.     The Defendants, therefore, are strictly liable to the Plaintiffs.   Additionally, Defendants' conduct was so outrageous as to constitute ill will, bad motive and reckless indifference to the interests of the consumers. Plaintiff, therefore, is entitled to punitive damages.

## COUNT II

## NEGLIGENCE

68.     Plaintiff, on behalf of himself and all other similarly situated realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein.

69.     Defendants owed a duty to Plaintiff to use reasonable care in its manufacture, distribution, and sale of its food products, which duty, if met, would have

prevented or eliminated the risk that the defendants' food products would become contaminated with Salmonella or any other dangerous pathogen. Defendants breached this duty.

70.     Defendants' duty extended to use of reasonable care in the manufacturing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing the eggs.

71.     Defendants had a duty to comply with all statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of its food product, but failed to do so, and were therefore negligent.  Plaintiff is among the class of persons designed to be protected by these statutes, laws, regulations, safety codes or provision pertaining to the manufacture, distribution, storage, and sale of similar food products.

72.     Defendants had a duty to properly supervise, train, and monitor its employees, and to ensure its compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of similar food products, but it failed to do so and were therefore negligent.

73.     Contrary to their duty, Defendants were guilty of one or more of the following careless and negligent acts and/or omissions:

(A)     Failed to adequately and properly test, inspect, and comply with federal and statutory regulations, including the Egg Safety Rule, so as to ascertain that the eggs were safe for the purpose for which they were manufactured, distributed, and sold;

(B)     Failed to utilize and/or implement a reasonably sterile environment in the manufacture of eggs;

(C)     Failed to manufacture eggs in a reasonably safe condition for public consumption, which it was intended;

(D)     Failed to adequately and properly warn Plaintiff purchasing eggs contaminated with SE of the risks of complications when used in a manner for which it was intended;

(E)     Failed to adequately and properly warn Plaintiff purchasing eggs contaminated with *Salmonella* of the risks of diseases when used in a manner for which it was intended;

(F)     Manufactured and distributed eggs contaminated with *Salmonella*, which constituted a hazard to health;

(G)     Manufactured and distributed eggs contaminated with *Salmonella* which caused adverse side effects;

(H)     Failed to institute a timely recall at the first detection of contamination of SE; and

(I)     Were otherwise careless and negligent.

74.     As a direct and proximate result of Defendants' manufacturing, testing, distributing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing eggs in interstate commerce, Plaintiff was at an increased risk of developing fever, abdominal cramps, diarrhea, headaches, and serious blood and organ

infections upon consumption and have suffered compensatory and punitive damages in an amount to be proven at trial.

## COUNT III
## NEGLIGENCE PER SE

75.     Plaintiff, on behalf of himself and all other similarly situated realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein.

76.      Defendants had an obligation not to violate the law in the manufacture, processing, assembly, inspection, marketing, packaging, preparation for use, sale and warning of the risks and dangers of eggs contaminated with Salmonella.

77.     Defendants had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of its food product, including, but not limited to, the requirements of the Federal Food, Drug and Cosmetics Act, 21 U.S.C. § 301 et seq and the Egg Safety Rule, 21 U.S.C.A. § 1035(a) and (b).

78.     Defendants failed to comply with the provisions of the health and safety acts identified above, specifically the violations recorded in the FDA's 483 reports, and, as a result, was negligent per se in its manufacture, distribution, and sale of food adulterated with Salmonella, a deadly pathogen.

79.     As a direct and proximate result of conduct by the defendant that was negligent per se, the Plaintiff sustained injuries and damages at an amount to be determined at trial.

## COUNT IV
## VIOLATION CONSUMER PROTECTION STATUTES

80.     Plaintiff, on behalf of himself and all other similarly situated realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein.

81.     Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of any and all state consumer protection statutes when it represented, through advertising, warranties, and other express representations, that their eggs were safe for the consuming public, which they were not.

82.     Defendants further violated state consumer protection statutes when it falsely represented that their eggs were of a particular standard or quality when they were not.

83.     Finally, Defendants violated state consumer protection statutes when it advertised their eggs with the intent not to sell it as advertised, and when, in so doing, Defendants concealed and suppressed facts material to the true characteristics, standards, and quality of consumable eggs.

84.     Defendants' deceptive practices were specifically designed to induce Plaintiff and Reimbursement Subclass to buy their eggs.

85.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff was damaged by paying in whole or in part for the purchased eggs.

86.     As a direct and proximate result of Defendants' violations of state consumer protection statutes, Plaintiff has sustained economic losses and other damages

for which they are entitled to statutory, compensatory damages and declaratory relief in an amount to be proven at trial.

## COUNT V
## UNJUST ENRICHMENT

87.     Plaintiff, on behalf of himself and all other similarly situated realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein.

88.     By reason of regular expenditures for the purchase of the contaminated eggs from the Defendants, Plaintiff has conferred substantial benefit on Defendants.

89.     As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefitted from the purchase of contaminated eggs by the Plaintiff.

90.     Defendants have voluntarily accepted and retained these profits and benefits, derived from the Plaintiff, with full knowledge and awareness that, as a result of Defendants' fraud and other conscious and intentional wrongdoing, Plaintiff did not receiving a product of the quality, nature, or fitness that had been represented by Defendants or that Plaintiff as a reasonable consumer, expected.

91.     By virtue of the conscious wrongdoing alleged in this Complaint, Defendants have has been unjustly enriched at the expense of the Plaintiff, who is entitled to in equity, and hereby seek, the disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy the Defendants' unjust enrichment.

**COUNT VI**
**BREACH OF IMPLIED WARRANTY**

92.     Plaintiff, on behalf of himself and all other similarly situated realleges each and every allegation contained in the foregoing paragraphs and incorporates them herein.

93.     Prior to the time that the contaminated eggs were ingested by Plaintiff, Defendants impliedly warranted to Plaintiff that the eggs were of merchantable quality and safe and fit for public consumption.

94.     Plaintiff was and is unskilled in the manufacture and distribution of eggs and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants.

95.     The eggs were neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that the contaminated eggs had dangerous propensities when ingested by the public, and would cause severe injuries to the consumer.

96.     As a direct and proximate result of Defendants' breaches of warranties, Plaintiff was, and continues to be, at an increased risk of developing severe abdominal cramps, fever, diarrhea, headaches, infection of the bloodstream, recurring joint pain, reactive arthritis, Reiter's syndrome, endocarditis, and death. Plaintiff has suffered compensatory and punitive damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays that the Court enter for judgment against the Defendants QUALITY EGG, LLC

d/b/a "Wright County Egg" and HILLANDALE FARMS OF IOWA, INC., and each of them, and in favor of Plaintiff and the Classes, and to award the following relief:

a) Certify this action as a class action including any subclasses which this Court deems appropriate to designate;

b) Designate Plaintiff as Class Representative;

c) Appoint Charles S. Zimmerman and Timothy J. Becker of Zimmerman Reed, PLLP as Lead Class Counsel;

d) Declare that the eggs recalled are dangerous and defective and that QUALITY EGG, LLC d/b/a "Wright County Egg" and HILLANDALE FARMS OF IOWA, INC.;

e) Order the return of monies QUALITY EGG, LLC d/b/a "Wright County Egg" and HILLANDALE FARMS OF IOWA, INC. have received from sales of the contaminated eggs to Class members;

f) Determine Defendants' liability for punitive/exemplary damages to the extent necessary and appropriate to punish and deter the conduct complained of herein;

g) Award compensatory  and punitive damages for the acts complained of herein, in an amount to be proven at trial

h) Order injunctive relief enjoining Defendants from producing shell eggs until they can insure against future outbreaks of SE by remodeling the facilities and establishing state of the art testing policies and procedures;

i)   Award all equitable, injunctive and monetary relief and penalties due to Plaintiffs and Class members (or for their benefit) under the various Consumer Fraud Statutes;

j)   Award all attorney's fees and costs of suit, as allowed by law; and

k)   Provide national consumer notice, at Defendants' expense, regarding participation in the class; and

l)   Order such other or further judicial determinations, and relief, as may be appropriate under the circumstances under the Court's exercise of its equitable jurisdiction and inherent authority in this proceeding.

## JURY DEMAND

The plaintiff hereby demands a jury trial on all claims so triable in this action.


Dated this 24th day of September 2010.

Respectfully submitted,

ZIMMERMAN REED, PLLP

s/ Charles S. Zimmerman
Charles S. Zimmerman, #120054
Timothy J. Becker, #256663
Elizabeth A. Peterson, #034347X
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone:  (612) 341-0400
Facsimile:  (612) 341-0844
E-mail: charles.zimmerman@zimmreed.com
E-mail: timothy.becker@zimmreed.com
E-mail: elizabeth.peterson@zimmreed.com